IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 14 2006

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

ASSOCIATION CASUALTY INSURANCE
COMPANY,

                    Plaintiff,

v.

PARAGON FOODS, INC., HUDDLE
HOUSE, INC., FERGUS ROBINSON,
DON GURLEY, IRISH NIXON,
RODRIGUEZ THORNTON, ANTAVIOUS
ROBINSON, and WILLIE SANFORD,

                    Defendants.

CIVIL ACTION NO.

1:04-CV-3752-JEC

## O R D E R   &   O P I N I O N

This case is presently before the Court on plaintiff's Motion for Summary Judgment [36] and defendant Paragon Food's Motion for Summary Judgment [37].   The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff's Motion for Summary Judgment [36] should be **GRANTED** and defendant Paragon Food's Motion for Summary Judgment [37] should be **DENIED**.

### BACKGROUND

This action involves a dispute about the scope of coverage of a commercial insurance policy.  (Compl. [1].)  Plaintiff issued the

policy to defendant Paragon Foods.  (*Id.* at ¶ 23.)  While the policy was in effect, defendants Fergus Robinson, Don Gurley, Irish Nixon, Rodriguez Thornton, Antavious Robinson, and Willie Sanford (the "claimants") sued Paragon for race discrimination.  (*Id.* at ¶ 13.) Paragon informed plaintiff of the suit, and requested a defense. Plaintiff tendered a defense under a reservation of rights, and filed this action seeking a declaration that the policy does not cover the claimants' allegations.  (*Id.* at ¶ 32.)

Plaintiff and Paragon have stipulated to the following material facts.  In the Spring and Summer of 2003, Paragon operated a Huddle House restaurant in Cairo, Georgia.  (Stipulations of Fact [36] at ¶ 2.)  The Cairo Huddle House was open 24 hours a day, seven days a week.  (*Id.* at ¶ 7.)  The claimants were customers of the Cairo Huddle House.  (*Id.* at ¶ 3.)

In mid-2003, the Cairo Huddle House instituted a "no dining-in policy" between the hours of 2 a.m. and 5 a.m. on Sunday mornings. (*Id.* at ¶ 1.)  During this time period, customers were required to wait in a line outside the Huddle House, and enter the restaurant in groups of ten.  (Stipulations of Fact [36] at ¶¶ 8-13.)  Once inside the restaurant, customers were required to place to-go orders.  (*Id.*)

The claimants filed suit against Paragon in October, 2004, contending that the no-dining-in policy was racially discriminatory. (*Id.* at ¶ 6.)  The claimants argued that the policy was

2

discriminatory because the majority of the Sunday morning crowd was black.  (*Id.*)  They also claimed that Paragon enforced the policy in a racially discriminatory manner, allowing white customers to enjoy "sit-down" dining services between 2 and 5 a.m. on Sunday mornings, while denying the same opportunity to black customers.  (*Id.* at ¶¶ 12-13.)  They asserted claims against Paragon under 42 U.S.C. § 1981 and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a ("Title II") for race discrimination in public accommodations. (Stipulations of Fact [36] at ¶ 1.)  They also asserted state law claims for deceptive trade and business practices.  (*Id.*)

During the relevant time period, Paragon maintained a commercial general liability policy with plaintiff.  (*Id.* at ¶ 17.)  The policy covered various types of claims, including "property damage," "bodily injury," and "personal and advertising injury."  (*Id.* at ¶¶ 18-20.)

The parties agree that none of the claimants suffered "property damage" or "bodily injury," as defined by the policy.  (*Id.* at ¶¶ 18-19.)  The only question for the Court to decide is whether the facts in the underlying complaint constitute "personal and advertising injury." (Stipulations of Fact [36] at *Id.* at ¶ 20.)  Plaintiff and Paragon have filed cross motions for summary judgment on this issue. (Def. Paragon's Mot. for Summ. J. [36]; Pl.'s Mot. for Summ. J. [37].)  Both motions are currently before the Court.

3

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

4

The movant bears the initial responsibility of asserting the basis for his motion.  *Id.* at 323.  However, the movant is not required to negate his opponent's claim.  The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II.  Georgia Insurance Law

The parties have not raised any choice of law issues in their briefs.  (*See generally* Def. Paragon's Mot. for Summ. J. [36] and Pl.'s Mot. for Summ. J. [37].)  Plaintiff and Paragon both cite Georgia law, operating under the assumption that Georgia law is

AO 72A
(Rev.8/82)

applicable.  Applying Georgia's choice of law rules,[1] their assumption appears to be correct.

Georgia has recently affirmed its commitment to the traditional *lex loci contractus* rule. *Convergys Corp. v. Keener*, 276 Ga. 808, 810, 582 S.E. 2d 84, 86 (2003).  *See also, Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 621 S.E. 2d 413 (2005).  Under this rule, the "interpretation of a contract [is] governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply."  *Lloyd v. Prudential Sec., Inc.*, 211 Ga. App. 247, 248, 438 S.E. 2d 703, 704 (1993).  Paragon's contract for insurance was executed in Georgia, and covered a business operating in Georgia. (Commercial General Liability Coverage Form ("CGL"), attached to Def. Paragon's Mot. for Summ. J. [37] at Ex. D.)  Thus, pursuant to the rule announced in *Lloyd*, Georgia law applies.  *Id.*

In Georgia, the ordinary rules of contract construction apply to an insurance policy.  *W. Pac. Mut. Ins. Co. v. Davies,* 267 Ga. App. 675, 676, 601 S.E. 2d 363, 366 (2004).  The parties to the policy "are bound by its plain and unambiguous terms."  *Id.*  *See also,*

---

[1]  Federal courts sitting in diversity apply the choice of law rules of the forum state.  *McGow v. McCurry,* 412 F.3d 1207, 1217 (11th Cir. 2005) (citing *Trumpet Vine Inv., N.V. v. Union Capital Partners I, Inc.,* 92 F.3d 1110, 1115 (11th Cir. 1996)).

AO 72A
(Rev.8/82)

*Georgia Farm Bureau Mut. Ins. Co. v. Meyers,* 249 Ga. App. 322, 324, 548 S.E. 2d 67, 69 (2001) ("Where the terms and conditions of an insurance contract are clear and unambiguous, such terms must be given their literal meaning."). Those terms "are given their ordinary and customary meaning," as defined in dictionaries. *W. Pac. Mut. Ins. Co.,* 267 Ga. App. at 678, 601 S.E. 2d at 367. *See also, Dep't of Transp. v. Meadow Trace, Inc.,* 274 Ga. App. 267, 270, 617 S.E. 2d 246, 248 (2005)("We look to a dictionary to provide the 'plain and ordinary sense of the word.'").

The relevant inquiry in interpreting terms in an insurance policy is not what the insurer intended the words to mean, but "'what a reasonable [insured] would understand them to mean.'" *W. Pac. Mut. Ins. Co.,* 267 Ga. App. at 680, 601 S.E. 2d at 368-69. *See also, Anderson v. S. Guar. Ins. Co.,* 235 Ga. App. 306, 308, 508 S.E. 2d 726, 730 (1998) (explaining that insurance contracts are construed "in accordance with the reasonable expectations of the insured") (citing *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615, 299 S.E. 2d 561 (1983)). Moreover, any ambiguities in the policy are construed against the insurer/drafter, and in favor of coverage.[2] *W. Pac. Mut.*

---

[2]    "Ambiguity exists when a contract term or condition is indistinct, uncertain of meaning or expression, and duplicitous." *Kerr-McGee Corp. v. Georgia Cas. & Sur. Co.,* 256 Ga. App. 458, 459, 568 S.E. 2d 484, 486 (2002). *See also, W. Pac. Mut. Ins. Co.,* 267 Ga. App. at 680, 601 S.E. 2d at 368 (explaining that a word or phrase is ambiguous when it is "of uncertain meaning, and may be fairly

7

*Ins. Co.,* 267 Ga. App. at 677, 601 S.E. 2d at 366.   With these
caveats, "an insurer may fix the terms of its policy as it wishes,
insuring against certain risks and excluding others."   *Id.* at 676,
366.

Paragon asserts that plaintiff has a duty to:  1) defend Paragon
in the underlying lawsuit; and 2) indemnify Paragon for any damages
incurred in the suit.   (Answer [5] at ¶ 32.)   In Georgia, "[a]n
insurer's duty to defend and its duty to indemnify are separate and
independent obligations."   *Nationwide Mut. Fire Ins. Co. v. Somers,*
264 Ga. App. 421, 424, 591 S.E. 2d 430, 433 (quoting *City of Atlanta
v. St. Paul Fire & Ins. Co.,* 231 Ga. App. 206, 209, 498 S.E. 2d 782
(1998)).   *See also, Anderson,* 235 Ga. App. at 308, 508 S.E. 2d at 730
("Just because the [claimants] alleged facts in their complaint that
would result in any damages being excluded from coverage does not, as
a matter of law, relieve [the insurer] of its separate duty to defend
the suit.").   In determining whether either duty exists, courts
compare the language of the policy with the allegations of the
underlying complaint.   *Nationwide,* 264 Ga. App. at 424, 591 S.E. 2d
at 433.   However, the duty to defend is broader than the duty to
indemnify.   *Id.*  "If the facts as alleged in the complaint even
arguably bring the occurrence within the policy's coverage, the

---

understood in more ways than one").

8

AO 72A
(Rev.8/82)

insurer has a duty to defend the action."   *Id.*

## III. Policy Terms

Paragon's insurance policy provides, in relevant part:

> We will pay those sums that the insured becomes legally
> obligated to pay as damages because of "personal and
> advertising injury" to which this insurance applies.   We
> will have the right and duty to defend the insured
> against any "suit" seeking those damages.   However, we
> will have no duty to defend the insured against any
> "suit" seeking damages for "personal and advertising
> injury" to which the insurance does not apply.

(CGL, Section I, Coverage B, § 1.a.)   The policy defines "personal

and advertising injury" as injury arising out of:

a.   False arrest, detention or imprisonment;

b.   Malicious prosecution;

c.   The wrongful eviction from, wrongful entry into, or
     invasion of the right of private occupancy of a
     room, dwelling or premises that a person occupies,
     committed by or on behalf of its owner, landlord or
     lessor; [or]

d.   Oral or written publication, in any manner, of
     material that slanders or libels a person or
     organization or disparages a person's or
     organizations goods, products or services . . .

(*Id.* at Section V, Definitions, § 14.)

Paragon contends that the claimants' allegations fall within the

"wrongful eviction" or "slander" provisions cited above.   The Court

does not agree.

A.   Paragon's alleged actions do not constitute "wrongful
     eviction."

AO 72A
(Rev.8/82)

Contrary to Paragon's assertion, the claimants' injuries cannot reasonably be interpreted as arising out of a wrongful eviction. (*See* Def. Paragon's Mot. for Summ. J. [36] at 11.)   The term "eviction" is commonly understood to mean the "exp[ulsion] or putting out [of] a tenant by legal process," and generally connotes a possessory interest in the property that is the subject of the eviction.   WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 448 (1988).   *See also,* BLACK'S LAW DICTIONARY 575 (7th ed. 1999) (defining "evict" as "to expel (a person, esp. a tenant), from real property, usu. by legal process"); and *City of Delray Beach v. Agric. Ins. Co,* 85 F.3d 1527, 1534 (11th Cir. 1996).   As the Eleventh Circuit explained in *Delray Beach*:   "'eviction' impl[ies] an interference with possessory rights."   *Delray Beach,* 85 F.3d at 1534.[3]   The claimants in this case were merely customers of the Cairo Huddle House; they did not have any possessory rights in the restaurant.   Accordingly, their wrongful exclusion from the restaurant was not an "eviction."   *Id.*

Although no Georgia court has considered this issue, numerous state and federal courts have interpreted similar provisions to require a possessory interest.   *See Dryden Oil Co. of New England v.*

---

[3]   In *Delray Beach*, the Court was interpreting Florida law.   85 F.3d at 1531.   The same general rules govern Florida and Georgia insurance law.   *Id.*   That is, the parties are bound by the plain and unambiguous terms of the policy, and any ambiguities are construed strictly in favor of the insured.   *Id.*

10

*Traveler's Indem. Co.,* 91 F.3d 278, 287 (1st Cir. 1996)("wrongful eviction . . . contemplates wrongful conduct by a landlord against its tenant"); *United States v. Sec. Mgmt. Co., Inc.,* 96 F.3d 260, 266 (7th Cir. 1996) ("An individual may not be 'wronged' by an eviction . . . unless that person first possessed a 'right' of occupancy."); *Liberty Mut. Ins. C. v. E. Cent. Oklahoma Elec. Co-op.,* 97 F.3d 383, 390 (10th Cir. 1996)("Actions for 'wrongful entry or eviction' deal with violations of one's real property rights."); *STK Enter., Inc. v. Crusader Ins. Co.,* 14 P.3d 638, 642 (Ore. App. 2000)("'wrongful eviction' . . . connotes an improper ouster from a possessory interest in property"); *Westfield Ins. Group v. J.P.'s Wharf, Ltd.,* 859 A.2d 74, 77 (Del. 2004)("wrongful eviction clause only applies to the eviction of claimants having a possessory interest in the premises").[4]

---

[4]   *See also, Zelda, Inc. v. Northland Ins. Co.,* 66 Cal. Rptr.2d 356, 364 (Cal. App. 1997)(clarifying that "the wrongfulness of the ejection must consist in, or attach to, an invasion of the right of occupation"); *Powell v. Alemaz, Inc.,* 760 A.2d 1141, 1147 (N.J. Super. 2000) (holding same); *Wackenhut Serv., Inc. v. Nat'l Union Fire Ins.,* 15 F.Supp. 2d 1314, (S.D. Fla. 1998)("wrongful eviction cases . . . generally involve something lacking in this case: either a defendant landlord who wrongfully evicts a plaintiff tenant or licensee; or a plaintiff who is an owner of real property, or holds a tenancy or easement in real property"); *Rosenberg Diamond Dev. Corp. v. Wausau Ins. Co.,* 326 F.Supp. 2d 472, 478 (S.D.N.Y. 2004)(denying coverage under an identical provision for a housing discrimination claim); *Martin v. Brunzelle,* 699 F.Supp. 167, (N.D. Ill. 1988)(finding no coverage where there was no "right of private occupancy"); and *State Farm Fire and Cas. Co. v. Burkhardt,* 96 F.Supp. 2d 1343, 1351 (M.D. Ala. 2000)(agreeing with the insurer that

*STK Enterprises* and *Westfield* involved facts similar to this case:   restaurants faced with customer race discrimination suits, seeking coverage under identical "wrongful eviction" provisions.   In both cases, the restaurants argued that "wrongful eviction" includes "improperly removing a person from property where the person is legally present." *STK Enter.*, 14 P.3d at 641; *Westfield*, 859 A.2d at 75.   The *STK* Court rejected that argument, explaining that:

> A 'wrongful eviction' within the context of [the restaurant's] policy connotes an improper ouster from a possessory interest in property. Here, the [claimants] had no possessory interest in the [restaurant].   It follows based on the plain language of the policy that there is no coverage . . . for the claims.

*STK Enter.*, 14 P.3d at 642.   The *Westfield* court similarly held that:

> Since the patrons who filed their racial discrimination complaints against [the restaurant] had no possessory interest in the restaurant premises, the 'wrongful eviction' provision in [the] insurance policy does not cover expenses it incurred in resolving those complaints.

*Westfield*, 859 A.2d at 77.   Georgia courts would likely reach the same conclusion. *Compare Nationwide Mut. Fire Ins. Co. v. Somers*, 264 Ga. App. 421, 427, 591 S.E. 2d 430, 435 (2003)(holding that an allegation of gravesite desecration comes within the wrongful eviction provision because it "implies a wrongful entry into or an invasion of the right of private occupancy of the grave site"), and

---

a wrongful eviction provision "unambiguously refers to a tenancy situation").

*Truitt Oil & Gas Co. v. Ranger Ins. Co.,* 231 Ga. App. 89, 498 S.E. 2d 572 (1998)(finding that a wrongful eviction provision did not cover damage arising from a gas leak onto the claimant's property). *See also, Stringer v. Bugg,* 254 Ga. App. 745, 747, 563 S.E. 2d 447, 449 (2002)(discussing wrongful eviction claim); and *Hogan v. Young Men's Christian Assen,* 82 Ga. App. 372, 61 S.E. 2d 161, 162 (1950)(holding that plaintiff failed to state a claim for wrongful eviction where he did not allege that he was defendant's tenant).

Paragon points out that one dictionary definition of "evict" is "to force out: expel." (Def. Paragon's Mot. for Summ. J. [36] at 15.) As the Eleventh Circuit noted in *Delray Beach*, however, this is not the most common understanding of the term. *Delray Beach,* 85 F.3d at 1534. Moreover, in the policy at issue in this case, the term "eviction" is surrounded by additional words that connote a possessory interest. For example, the wrongful eviction provision covers interference with the "right of *private occupancy*" by an "owner, landlord or lessor." (CGL at Section V, Definitions, § 14.) These surrounding words support the Court's conclusion that, as used in the policy, an "eviction" requires some possessory interest in the subject premises. *See Delray Beach,* 85 F.3d at 1534 (noting that "general and specific words capable of analogous meaning when associated together take color from each other"); and *Zelda,* 56 Cal. App. 4th at 1265 ("an insurance policy, like any other contract, must

13

be construed in its entirety, with each clause lending meaning to the other"). Finally, Paragon's alleged actions do not even strictly come within its own expanded definition of "evict": the claimants allege that they were required to wait in line and place to-go orders, not that they were forcibly expelled from the property. (*See generally,* Complaint, attached to Pl.'s Mot. for Summ. J. [37] at Ex. A.)

The Court is aware that a minority of courts has interpreted the "wrongful eviction" provision more broadly. *See, e.g., Z.R.L. Corp. v. Great Cent. Ins. Co.,* 510 N.E. 2d 102 (Ill. App. 1987); *Int'l Ins. Co. v. Rollprint Packaging Prod., Inc.,* 728 N.E. 2d 680 (Ill. App. 2000); *Gardner v. Romano,* 688 F. Supp. 489 (E.D. Wisc. 1988); and *Ins. Co. of N. Am. v. Forrest City Country Club,* 819 S.W. 2d 296 (Ark. App. 1991). These cases are either inapplicable or unpersuasive.

As an initial matter, several of these cases involve more ambiguous policy language. In *Z.R.L.,* for example, the policy covered claims arising out of:

> False arrest, malicious prosecution, detention, imprisonment, libel, slander, defamation of character, invasion of privacy, wrongful eviction or wrongful entry . . . committed in the conduct of the named insured's business.

*Z.R.L.,* 510 N.E. 2d at 103. The *Z.R.L.* court found this provision broad enough to cover a claim for race discrimination arising out of

the insured's removal of two black customers from its club.  *Id.* at

104.   In so holding, however, the court distinguished other cases

denying coverage for similar claims, explaining that in those cases:

> "wrongful eviction" was included in a series of terms
> relating to invasions "of the right of private
> occupancy," while in the instant case the term was
> included in a group of torts which involve patrons.

*Id.*  In this case, "wrongful eviction" likewise appears in a series

of terms involving "the right of private occupancy."  Accordingly,

*Z.R.L.,* and other cases addressing similar policy provisions, do not

apply.  *See also, Rollprint Packaging,* 728 N.E. 2d at 689 (relying on

*Z.R.L.*).[5]

Of the cases addressing similar policy language, several involve

housing discrimination claims.  In *Gardner v. Romano,* for example,

potential tenants sued the owner of an apartment complex that refused

to rent them an apartment, claiming that the refusal was racially

motivated.  *Gardner,* 688 F. Supp. at 490.  The court held that the

potential tenants' allegations arguably came within the "wrongful

eviction" provision of the complex owner's insurance policy.  *Id.* at

---

[5] The "wrongful eviction" provision in *Rollprint Packaging* was
more similar to the provision in Paragon's policy, but still did not
mention the "right of private·occupancy."  *Rollprint Packaging,* 728
N.E. 2d at 685.   In addition, *Rollprint Packaging* is factually
distinguishable.   In *Rollprint Packaging,* the insured physically
removed an employee and his personal belongings from the office space
he had previously occupied.   *Id.* at 692-93.   Thus, unlike the
restaurant customers in this case, the former employee in *Rollprint
Packaging* arguably had some possessory rights in the premises.

AO 72A
(Rev.8/82)

493.   The discriminatory refusal to rent a premises constitutes an interference with a *potential* possessory right.   Housing discrimination claims may therefore present a reasonable basis for extending the policy language.   *But see, Martin v. Brunzelle,* 699 F.Supp. 167, 171 (N.D. Ill. 1988)(rejecting coverage for a similar housing discrimination claim), and *Sec. Mgmt. Co.,* 96 F.3d at 266 (holding same).   However, these cases have no relevance to the case at bar.   As customers, the claimants did not even have a potential right to possession of the Cairo Huddle House premises.

There is one case from the Arkansas Court of Appeals, finding coverage under a similar "wrongful eviction" provision, that is essentially on point.[6]  *See Ins. Co. of N. Am. v. Forrest City Country Club,* 819 S.W. 2d 296 (Ark. App. 1991).   However, the Court finds *Forrest City* unpersuasive.

In *Forrest City*, the plaintiff sued a country club for race discrimination after the club refused to let the plaintiff use its tennis facilities.   *Id.* at 297.   The club sought coverage for the suit under a "wrongful eviction" provision similar to the term in

---

[6]  There is another case from the Third Circuit finding a similar term ambiguous, and thus subject to a construction in favor of coverage, under Delaware law.  *See New Castle County v. Nat'l Union Fire Ins. Co.,* 243 F.3d 744, 756 (3d Cir. 2001).   However, the Delaware Supreme Court later clarified that under Delaware law, a "wrongful eviction clause only applies to the eviction of claimants having a possessory interest in the premises."  *Westfield,* 859 A.2d at 75.

Paragon's policy. *Id.* Construing the term "evict" to mean "to force out or eject," the court held that the plaintiff's allegations came within the policy coverage. *Id.* at 298.

As plaintiff notes, the *Forrest City* court's definition of "evict" ignored Arkansas case law defining "eviction" as "interference with [a] tenant's enjoyment of the premises." *See Burdan v. Walton,* 689 S.W. 2d 543, 545 (Ark. 1985). *Forrest City's* definition also contradicts the common understanding of the term "eviction," as expressed by the Eleventh Circuit. See *Delray Beach,* 85 F.3d at 1534. Even accepting *Forrest City's* definition of "evict," the decision relies on the flawed assumption that "banning" is the same thing as "forcing out" or "ejecting." As discussed, this Court does not accept that proposition. For all of these reasons, the Court joins many others in rejecting *Forrest City. See, e.g., Zelda,* 56 Cal. App. 4th at 1265 (disagreeing with the reasoning of *Forrest City);* and *Liberty Mut. Ins. Co. v. E. Cent. Oklahoma Elec. Co-op.,* 97 F.3d 383, 390 (10th Cir. 1996)(noting the "clear weight of authority" against *Forrest City).*

Paragon correctly points out that any ambiguities in an insurance policy must be construed against the insurer, in favor of coverage. However, courts are not authorized to rewrite the policy language to achieve a desired result. *W. Pac. Mut. Ins. Co.,* 267 Ga. App. at 676, 601 S.E. 2d at 366 ("Insurance in Georgia is a matter of

AO 72A
(Rev.8/82)

contract and the parties to the contract of insurance are bound by
its plain and unambiguous terms."). The parties agree that "[t]he
gravamen of [the claimants'] allegations is that they were wrongfully
excluded from the Cairo Huddle House." (Def. Paragon's Mot. for
Summ. J. [36] at 11.) These allegations, under any reasonable
interpretation, do not constitute an "eviction." Accordingly, the
Court finds that plaintiff has no duty to defend or indemnify Paragon
under the "wrongful eviction" provision of the policy.

     B.    <u>Paragon's alleged actions do not constitute "slander."</u>

     Paragon contends that the claimants' allegation that they
suffered "emotional distress, humiliation, [and] mental anguish"
triggers coverage under the "slander" provision of the policy. (Def.
Paragon's Mot. for Summ. J. [36] at 17.) However, "emotional
distress, humiliation" and "mental anguish" is merely a list of the
types of damages the claimants allegedly suffered as a result of the
Cairo Huddle House's no-dining-in policy. (Complaint at ¶¶ 36, 43,
51, 56, attached to Pl.'s Mot. for Summ. J. [37] at Ex. A.) The
claimants' list of potential damages in no way indicates that any of
these damages were caused by "slander."

     In fact, there is no allegation in the underlying complaint that
could conceivably be interpreted to trigger the "slander" provision.
Georgia defines slander as:

     [an] oral defamation [that] consists in:

18

(1)    Imputing to another a crime punishable by law;

(2)    Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society;

(3)    Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or

(4)    Uttering any disparaging words productive of special damage which flows naturally therefrom.

O.C.G.A. 51-5-4 (a). The claimants do not allege any "oral defamations," much less any defamations that come within the above categories. (*See generally,* Complaint, Ex. A.)

Even relying on Paragon's own definition of "slander," the term requires a defamatory *statement* or *utterance.* (Def. Paragon's Mot. for Summ. J. [36] at 16 (defining "slander" as "to utter slander against: defame").) *See also,* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1092 (1988)(defining "slander" as "an "utterance of defamatory statements injurious to the reputation or well-being of a person"); and BLACK'S LAW DICTIONARY 1392 (7th ed. 1999)(defining "slander" as "a defamatory statement expressed in a transitory form, esp. speech"). The claimants do not allege that Huddle House employees made any statements whatsoever, beyond informing the claimants themselves about the no-dining-in policy in effect on early Sunday mornings.

In addition, the policy by its own terms requires "oral or

19

written publication." (CGL, Section V, Definitions, § 14.d.) As the claimants have not even alleged any defamatory statements, it follows that their allegations do not meet the contractual requirement of "publication" of those statements. *See McClesky v. The Home Depot, Inc.,* 272 Ga. App. 469, 471, 612 S.E. 2d 617, 619 (2005)("Generally, publication is accomplished by communication of the slander to anyone other than the person slandered."). Accordingly, the Court finds that plaintiff has no duty to defend or indemnify Paragon under the "slander" provision of the policy.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiff's Motion for Summary Judgment [36] and **DENIES** defendant Paragon Food's Motion for Summary Judgment [37].

SO ORDERED, this ___13___ day of September, 2006.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

20